DeSaussure, Ch.
This case was originally heard by me on a single point, and I decided that the words of a certain deed distinctly gave a separate estate to Miss Polly McLew-rath, (now Mrs. Polly Calhoun,) with all the qualities attached to separate estates, in two slaves, Dinah and Mary, with their future issue.
This case was afterwards heard by Chancellor Harper. The plea of the defendant, Dixon Thompson, was, that he was a purchaser from Calhoun and wife, for valuable consideration, without notice, of a slave which had been conveyed to a trustee, to the separate use of the wife. The Chancellor overrruled the plea, and ordered that it be referred to the Commissioner, to inquire and report whether the sale of the slave in question, to the defendant, was the act of the complainant, without the control of her husband ; whether the said sale oí the said slave was necessary to the support of the complainant and her children, and whether the proceeds of the sale,, or what part of them, were applied to such necessary support; reserving the equities which may arise on the coming in of such report.
The reference has been had, and the Commissioner reports, that he is inclined to think, from the evidence, that the complainant was in some measure influenced by her husband to sign the bill of sale (of the slave in question) to the defendant, Thompson, though she was placed under no actual constraint. That the Commissioner is induced to think that the sale of the slave was necessary to the support of the complainant and her children, as it appears they managed badly, and she and her children must have suffered if they had not sold *232 some of the property. The evidence was satisfactory that they had no other property which could have been sold without selling their provisions. And the evidence goes strongly (though not positively,) to prove that a considerable portion of the proceeds of the sale was applied to the payment of debts contracted for necessaries; to wit: to Mr. Beck for 50 bushels of corn $50; to Mr. Hewlett for fodder, and Mr. Peyton for sugar, coffee, shoes and a saddle, &c. the amount of which does not appear. Forty dollars were also borrowed'by Polly Calhoun from Beck, but it does not appear how it was applied. It was proved that Mrs. Calhoun said she always intended that Mr. Canady should be paid.
To this report exceptions were filed by the counsel for the defendant;
1. Because it was proved that the sale of the slave in question was the act of the complainant, without the control of her husband, and that the Commissioner ought to have so reported.
2. Because although it was proved that James Calhoun, (the husband of complainant,) was, before and at the time, indebted to Hewlett, Beck, Peyton aud Canady, yet the amounts do not distinctly appear, nor is there evidence that any part of the purchase money was paid.
These exceptions were overruled by the Commissioner and now come up to be decided by the Court. Upon recur-’ rence to the decree of Chancellor Harper, it appears that after overruling the plea of the defendant, Dixon Thompson, that he was a purchaser for valuable consideration without notice, on the ground that notice was proved by one witness supported by circumstances, he proceeds to state that though it has been decided by our Courts that a married woman cannot dispose of her separate estate by her own act, yet the Court will charge it with debts that have been ne-cessarrly incurred for the purposes of the trust, and the wife may charge and dispose of her separate estate for her necessary support. But that it must appear to have been her own act; to have been necessary; and the application of the money must be shewn. The Chancellor therefore directed the inquiry before the Commissioner above stated.
The first exception brings up the inquiry, whether the sale of the slave in question was the voluntary act of Polly Calhoun, the wife of James J. Calhoun. The bill of sale is dated the 29th Novr. 1827, and in consideration of $275, conveys a negro girl, Jemimah, to Dixon Thompson. It was .executed by Mary Calhoun and James J. Calhoun, in the presence of a subscribing witness.
The presumption is, that a person who executes a deed or instrument" of writing, does it willingly and deliberately, meaning to do what the deed purports. This presumption *233 does not arise in the case of a feme covert, and if it did, is rebutted. That presumption is weakened in the case of a wife who is supposed (truly or not, as the case may be) to be under the control of her husband. The Commissioner in his report states, that he thinks the wife was in some measure influenced by her husband to sign the bill of sale to Thompson, of the slave in question,, though she was placed under no actual constraint. This statement seems to negative the idea of control, which was the print of inquiry directed by the Chancellor.
The exercise of influence, whether founded on affection or on a deference to superior judgment, has never been considered such a constraint on the will of a party acting under it, as to vitiate his act, more especially when we perceive that there are other motives sufficiently powerful to produce the effect of the party acting as he did. Now ih this case, the evidence stated and relied on by the Commissioner, shews a strong motive of voluntary action by the wife. The husband was of that miserable class of men who is described as worse than a heathen ; he did not provide for his family by his honest industry. The Commissioner reports, (and this touches the very point of the second inquiry directed by the Chancellor,) that the sale of the slave was necessary to the support of the complainant and her children, who must have suffered if they had not sold some of the (trust) property ; and they had no other property which could have been sold, without selling their provisions. It appears further by the report, that a considerable portion of the proceeds of the sale was applied to the payment of debts contracted for necessaries, to wit, corn, fodder, sugar, coffee, a saddle, shoes, <fcc.., all of the first necessity, and Mrs. Polly Calhoun herself received from Beck $40; and it appears that the purchaser, Dixon Thompson, settled with the creditors, for they assign to him on the back of the bill of sale their interests — at least the intention is obvious, though clumsily arranged and expressed. It appears to me then that the inquiries directed by Chancellor Harper have been responded to, and shew satisfactorily that there was no such improper control on the part of the husband, under the circumstances, as ought to vitiate the bill of sale ; and that there was a necessity for the sale, to "support the family; and that the debts contracted for necessaries have been satisfied by this arrangement. It is therefore ordered and decreed, that the bill of complaint of Polly Calhoun be dismissed; but without costs.
The above case was argued with great learning and ability by Mr. Patterson, for the complainant, and Col. Butler, for the defendant. But not a word was said in argument in relation to the case of Hewlett & Co. v. James Calhoun and Polly his wife, which was on the docket, and was stated to *234 the Court to have some connexion with the above case. But ag there was no evidence, and no-argument, no decree can be made on that case. .
i Ves. J. 48.
l Ves. J. 193.
2Meriv. 482.
Complainant Polly Calhoun appealed.
1. Because the complainant (Mrs. Calhoun) had no power to sell the slave in question.
2. Because the sale to Thompson was not the voluntary act of Mrs. Calhoun.
3. Because the sale of the slave was not necessary to the support of Mrs. C. and her children.
4. Because the proceeds of the sale was not applied to such necessary support.
5. Because the decree is contrary to evidence, law, equity, and good conscience.
Curia, 'per O’Neall, J. — At common law a feme covert was regarded as legally incapable of making any contract, which- would bind her. This disability was intended to be her protection. It was founded on the notion that her existence was legally merged in her husband. They were regarded in law as one person. She was supposed to have no will of her own, and hence was legally incapable of charging herself by contract. Neither could she have a personal estate which did not vest in the husband jure mar ¿ti. From her real estate, he was, during coverture, entitled to the receipt of the rents, issues and profits ; and after her death, he was entitled, if there was issue of the marriage, bom alive, to hold during his life, by the curtesy, the whole of her land of which he had actual possession during the coverture. In the progress of time, and out of the refinements, and perhaps the necessities, of society, it was permitted in equity that the wife should have both personal and real estate separate from her husband.. Incidental to this right of property, it was held, with different modifications at different times, that she was as to it a feme sole, with power to charge or dispose of it. Fettiplace v. Georges. From the English cases it may be deduced as a general rule, that a feme covert, unless restrained by the deed of settlement, had the right to dispose of or charge her seperate personal estate as a feme sole. For in Pylins v. Smith, Lord Chancellor Thurlow states the rule to be that “she [a. feme covert) is sole, so far as she has a power of appointment; but with any limitations in the deed giving her that power.” In Jackson v. Hobhouse, where, by a settlement, the interest of a sum of money was to be received to the separate use of the wife, with a proviso against the wife assigning or otherwise disposing of the interest in anticipation, the wife and her husband, in order to obtain an annuity, assigned the future interest, and the Lord Chancellor Eldon held that the clause against an assignment in *235 anticipation was good, and restricted the power of the wife over her separate estate. He says “it is now too late to contend against the validity of a clause in restraint of anticipation.” In Jaques v. The Methodist Episcopal Church, the Court of Errors of the State of New York held that a feme covert, with respect to her separate property, was to be regarded in a Court of Equity as a feme sole, and might dispose of it without the assent and concurrence of her trustee, unless she was specially restricted by the instrument under which she acquired her separate estate. In the same case Chancellor Kent, after a full review and elaborate examination of all the cases, comes to the conclusion that a feme covert in Equity, as to her separate estate, is to be regarded as a feme sole, “sub modo, or to the extent of the power clearly given by the instrument.'1’ In Ewing v. Smith, a majority of the Court of Appeals in Equity, in this State, held that a married woman who has a separate estate cannot part with it or charge it in any way, without an examination ; that as by marriage she loses all the powers of a feme sole, a separate estate does not confer all those powers on her, and that therefore the power of appointing such estate must be expressly given, and the mode prescribed be strictly pursued. Since this decision the rule has been considered settled as laid down in it; and if I was disposed to doubt its correctness, I should not feel at liberty to lay down another. But I concur fully in its wisdom. To permit any other would be to defeat every separate estate. For to the kindness, force, or a necessity created by the acts of an improvident husband, most women would at some period be compelled to yield up the property which the kind and prudent care of parents or friends had intended as a permanent provision for herself.— The rule laid down in Ewing v. Smith would dispose of this case. For the wife, in the deed from which her separate estate is derived, has no power of disposition: and her alienation has been without examination in the Court of Equity. If the deed had merely given her a separate estate without restriction, and she had. voluntarily aliened, for the necessary support of herself and her children, her sale might •have been sustained. For in that case, the Court of Equity would have permitted the sale to have been made if it had been applied to for that purpose, and acting upon the equity maxim, that it considers that as done which ought to have been done, the sale, would have been confirmed. In the deed in this case there is, however, an express restriction upon the power of the wife: after conveying the property in trust for the complainant and the heirs of her body, the deed provides that it shall not be “ subject to any alienation whatever in case of her marriage, and excluding forever every claim or pretence of claim by her husband to the said slaves.” This, *236 according to the English cases, and the decision of the New York Court of Errors in the case of Jaques v. The Methodist Episcopal Church, is such a restraint.upon the.power of the wife over her separte property as would prevent her alienation from taking effect. If this restraint had been imposed on a donee not laboring under any legal disability, it would even then prevent an alienation. For unless contrary to some rule of law, a donor has the right to impose such limitations and restrictions on his gift as he may think proper.— In the case of a feme covert, who at common law is considered as incompetent to do any legal act of alienation, it cannot be that she would have greater powers than one who is under no legal disability. But it is said, that the sale was necessary to her support, and hence it ought to be sustained. The Court of Equity has no power either to make or confirm a sale of a separate estate, which, by the deed creating it, is expressly prohibited from being sold. On the facts, however, I should be disposed to think, (if this restriction in the deed did not exist,) that the sale could not be sustained. In such a case the sale must have' been the voluntary act of the wife, and for such purposes as the Court, on her examination, would have ordered it to be made. In this instance, it appears that the wife, by the persuasion of the husband and the threats of the constable, Beck, did sign the bill of sale. It is true the Commissioner and Chancellor both conclude she was under no actual constraint; by which I understand there was no legal duress. This, however, was not necessary to be shown to avoid her acts. In law, she is always, in the presence of her husband, supposed to act by his compulsion, and her act is therefore considered as his. It was for those undertaking to sustain the sale, to show it to be the result of her own will. If it arose from the persuasion of the husband, who has been pronounced, by the Chancellor to be of that class “ who are described as worse than an heathen,” it was his sale and not hers : but when we add to this that the officer of the law was saying to her — if you do not sign the’ bill of sale, I will levy executions on your corn and horse, it would surely be asking a great deal, to require a Court to pronounce a sale so made by a feme covert to be her own voluntary act. The propriety of the sale, too, has not been made out. For all the debts, to pay which the slave was sold, were debts contracted by the husband. It is possible they were for supplies for his family, but the credit was given to him and not to his wife, and in such a case it would be in vain to ask an order for the sale of the wife’s separate estate from the Court of Equity. The report of the Commissioner is no answer to the inquiries which Chancellor Harper directed him to make. It was his business to examine as to the points submitted to him, and give the Chancellor the benefit of his *237 judgment upon them. If his report can be regarded as deciding anything, it must, instead of being against the com plaiuaut, be considered in her favor: 1st. In deciding that the bill of sale was executed unwillingly by her; 2d. That the proceeds of the sale were applied to the payment of debts contracted by the husband before the sale ; and 3d. That a part of those debts were not necessary to the support of the complainant.
7 R'5 -
3 J. C. U. 113.
3 Eq. Rep, 4X7, 46a
*237 In every point of view I think the sale by James J. Calhoun and wife, of the slave Jemima, to Dixon Thompson, the defendant, cannot be sustained.
It is therefore ordered and decreed that the decree of Chancellor DeSaussure be, reversed, that the defendant, Dixon Thompson, do deliver up the slave Jemima and her child or children (if any) and account for her hire, to such trustee as may be appointed by the Court of Equity for Barnwell District, for the complainant,- and that the said Dixon Thompson do pay the costs of this suit.
The whole Court concurred.

Decree reversed.